# Richmond

## DU PONT ENGINEERING COMPANY V. NICOLAS M. BLAIR.

### March 17, 1921.

1. VARIANCE—*Necessity of Objection.*—It is elementary law that the proof must correspond to the allegations. But a party wishing to avail himself of this rule is required to make timely objection to the variance.

2. VARIANCE—*Objection to Variance—Waiver of Variance—Case at Bar.*—In the instant case, an action by a servant against his master, there was no proof of any defect in the machinery rendering the servant's place of work unsafe, but there was evidence to the effect that the master failed to warn the servant in regard to the hazards of his employment not open and obvious. The declaration contained allegations that the machinery was defective and the place of work unsafe, but contained no allegation as to the failure of the master to warn the servant.

   *Held:* That this ordinarily would have constituted a fatal variance, but the question of variance was waived by the reception of testimony on the question of lack of warning without objection by defendant. If defendant had objected to this testimony and the court had sustained the objection, plaintiff would then have had an opportunity to amend his allegations.

3. MASTER AND SERVANT—*Assumption of Risk—Contributory Negligence—Questions of Law and Fact—Case at Bar.*—In the instant case, an action by a servant against his master for injuries, defendant contended that a verdict for plaintiff should have been set aside, because plaintiff assumed the risk of the danger and was guilty of contributory negligence. The machinery and its operation, through which plaintiff was injured, though simple enough when explained and understood, was unusual in its character.

   *Held:* That under the evidence, the questions of whether the plaintiff assumed the risk or was guilty of contributory negligence were properly referred to the jury.

4. MASTER AND SERVANT—*Evidence—Declarations and Admissions.*— In an action by a servant against his master for injuries, plaintiff testified that while he was in the hospital "the chief safety man" for defendant, after plaintiff had related the

cause of the accident to a physician, said, "Doctor, we have had a great deal of trouble with that machinery."

*Held:* Admissible, the fair inference being that the "chief safety man" was an employee of the defendant, present at the hospital in connection with plaintiff's injury in the regular course of his business.

5. Expert and Opinion Evidence—*Qualification of Expert.*—In an action by a servant against his master for injuries, a witness who had worked for defendant for about six months, but had actually worked only eight days in the building in which plaintiff was injured, is qualified as an expert, where his testimony showed perfect familiarity with the machinery and its operation, which was the cause of plaintiff's injuries.

6. Appeal and Error—*Harmless Error—Irrelevant Evidence.*— Where in an action by a servant against his master for injuries, it must have been understood by everybody connected with the trial that the accident was due to the fact that a trolley was not properly placed, and that the sole question for determination was whether the defendant was liable to the plaintiff for a failure of duty in warning and instructing him in this particular, admission of testimony that the accident could not have taken place unless the machinery was defective, if erroneous, was harmless.

7. Appeal and Error—*Instructions—Harmless Error.*—In an action by a servant against his master for injuries, an instruction as to the duty of the master in regard to safe machinery and appliances, although inappropriately worded, is not fatal, where the issue as developed by the evidence was whether the master failed in his duty to instruct and warn the servant.

8. Appeal and Error—*Instructions—Variance—Instructions Upon a Point as to which there is Evidence but no Allegation.*—Where a case is tried upon a theory as to which the declaration might have been amended, upon testimony which would have been applicable to the declaration as so amended, and without any objection to such evidence, instructions applicable to this view of the case, which could not have been misunderstood by the jury, though inaccurately phrased, cannot be made the ground of reversal.

9. Appeal and Error—*Instructions Inapplicable to Evidence— Harmless Error—Case at Bar.*—Instructions ought not to be given which are not applicable to the evidence, and to give them constitutes reversible error when there is reason to suppose that they probably misled the jury. In the instant case, however, where the issue was as to the lack of warning of danger by a master to his servant, instructions in regard to the master's liability for defective machinery, though inapplicable to the evidence, probably did not mislead the jury.

Error to a judgment of the Circuit Court of York county in an action of trespass on the case.  Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Henley, Hall, Hall & Peachy* and *Plummer & Bohannan,* for the plaintiff in error.

*E. V. Farinholt, David Meade White* and *Conway H. Shield,* for the defendant in error.

Kelly, P., delivered the opinion of the court.

This is a writ of error to a judgment in favor of Nicholas M. Blair against the Du Pont Engineering Company in an action to recover damages for personal injuries sustained by Blair while in the employment of that company.

At the time of the accident the Du Pont Engineering Company was engaged in the business of loading large-caliber shells for the United States government, at Penniman, in York county.  These shells, very much in the shape of an ordinary pistol cartridge, were about eight inches in diameter, about twenty-eight inches in length, and weighed in the neighborhood of 200 pounds.  Blair went to work for the company on the 12th of August, 1918, and worked for two days at the very simple task of cleaning rust from the shells by means of sandpaper or a wire brush.  On the third day he was assigned to the work of attaching and elevating shells to an overhead track suspended from the ceiling of the building in which he was employed.  This operation was perhaps not very difficult for a man who understood it, nor very complex in its nature.  To describe the work, however, so that the operation may be clearly visualized from a description, without any ocular demonstration, is not an easy task.

54

The overhead track referred to consisted of a single rail, in the shape of an "I" beam, suspended from the ceiling of the building. On this track were a number of four-wheeled carriers, called in the record "pulleys," or "trolleys," or "gigs." Each carrier was complete in itself and independent of the others. To each of them on the lower side was attached a steel cable, extending toward the floor of the building, and used for elevating or moving the heavy shells. By means of the cable, whether the same was merely hanging loose or was attached to the nose of a shell, the carriers could be moved by hand back and forth along the track. At the lower end of each cable was a hook which could be fastened into a hook on the small end of the shells. The wheels of the carriers moved on two flanges at the lower side of the rail (a pair of wheels on each flange), and were so adjusted that they could not separate and slip off of the flanges.

At certain points along the overhead track were located air hoists, which were operated by compressed air, and at these points a short section in the track was so constructed and adjusted that it could be detached and lowered several feet from its position in the permanent track. Each of these short sections was about three feet long. The proper and safe method of elevating and moving the shells was about as follows: The operator would take hold of the cable, move the carrier, which was about nine inches in length, to a position practically in the center of the short and movable section, then, by the use of a lever, lower the short section, thus bringing the hook of the cable in reach of the shell as it stood on its end, attach the hook to the nose of the shell, and then again, by the use of a lever, release the short section so that it would by air pressure go back to its place in the permanent track, carrying the weight of the shell with it. When the short section assumed its place in the permanent track, the shell as thus suspended could be

moved forward or backward on the track by means of the cable and pulley.

On the short or movable section of the track, at a distance of about a foot from each end, there was a device known as safety catches, or safety dogs, which automatically came in place as the short section was lowered from its position in the permanent track, and thus operated as a stop or brace to prevent the carrier from rolling off at either end, while the short section was disconnected.

There was a conflict in the evidence as to whether the foreman, a youth nineteen years of age, who put Blair to work at these carriers, explained to him the imperative importance of seeing that the carrier was between the safety dogs before he lowered the short section. To one who understood the mechanism, it would be readily apparent that if the trolley was not in proper position—that is, if it was allowed to be entirely clear of the safety dogs at either end—it would be likely to run off of the end of the track as soon as it was lowered, or certainly when, with the heavy shell attached, it started back towards the ceiling. The foreman who directed Blair to take up this new work says that he fully instructed and warned him in this respect. Blair says he gave him no warning whatever, but simply told him to raise and lower the track by means of the lever, and did not intimate to him that there would be any danger of the trolley running off under any circumstances.

Blair had been working at this job for several hours, and had elevated quite a number of shells. While so engaged, however, and after the lapse of several hours, he lowered a section of track, attached a shell to the hook in the cable, and, as the track was ascending in response to his use of the lever, the trolley, which, instead of being between the dogs was entirely outside of them and near the end of the section, rolled off, and thus allowed the shell to fall, inflicting the injury for which this suit was brought.

We have stated that the accident was due to the fact that the trolley was at the end of the short section instead of being properly placed between the safety dogs. This does not seem to have been the plaintiff's original theory, nor did his testimony in the outset tend to establish any such theory. Upon the contrary, he testified at one or more points in his evidence that the short section of track itself came down with the trolley. It is stated in substance in the opening brief for the company that the plaintiff abandoned the latter contention before the end of the trial, and was brought to rely upon the theory that, although the mechanism itself was in proper working order and free from defects, it was dangerous to an operator who did not understand that the trolley could move from the center of the track and fall, and that the plaintiff had no such knowledge, and was not properly instructed and warned in that respect by the defendant before he was put to work. This position does not seem to be controverted, seems to be borne out by the general course of the trial, as shown in the record, and as it was insisted upon by the plaintiff in error, we may safely assume that to decide the case accordingly cannot operate to its prejudice. We shall, therefore, deal with the case upon that theory.

There were two counts in the declaration. In the first the negligence charged was that the defendants "did negligently, carelessly and wrongfully furnish and provide the said plaintiff with a defective, unsafe and dangerous air-pressure elevator with which to work, which said air-pressure elevator the said defendants on the day and year aforesaid knew was defective, unsafe and dangerous, or they could have known it by the exercise of ordinary care on their part." The negligence charged in the second count was that the defendants "did negligently, carelessly and wrongfully fail and neglect to furnish and provide the said plaintiff with a reasonably safe place in which to work

while in the discharge of his said duties in the exercise of ordinary care on his part, all of which the said defendants knew, or could have known by the exercise of ordinary care on their part  *  *  *" And "that the said place where he was required to work in the discharge of his duties aforesaid was dangerous and exposed him to extraordinary hazard to his life and limb, without knowledge on his part; the place was rendered dangerous by reason of the defective condition of the said air-pressure elevator, which, by reason of the defect, was liable to fall upon and injure the said plaintiff without default on his part and while he was in the discharge of his duties aforesaid in the exercise of ordinary care."

The first error assigned is that the trial court improperly refused, upon the motion of defendant, to enter final judgment in its favor, pursuant to the provisions of section 6251 of the Code. This section provides that when the verdict of the jury in a civil case is set aside by a trial court upon the ground that it is contrary to the law and the evidence, or without evidence to support it, a new trial shall not be granted if there is sufficient evidence before the court to enable it to decide the case upon its merits, but such final judgment shall be entered as to the court shall seem right and proper.

[1, 2] In support of this assignment it is contended, first, that the plaintiff failed to prove any actionable negligence on the part of the defendant. The gist of the argument is that there was no proof of any defect in the machinery, rendering the place unsafe, and that as these were the only allegations of negligence in the declaration, the plaintiff has failed to make out his case. In dealing with this contention we are assuming, as already indicated, that there was no proof to show that the machinery was not in good working order and reasonably safe for one acquainted with the dangers ordinarily incident to the work. Upon

this assumption, it may be said, as a general proposition of law, that there would be no liability in the absence of allegation and proof that the defendant failed properly to warn and instruct the plaintiff in respect to such hazards of the operation as he would not be bound to know because of their open and obvious character. It is elementary and familiar law that the proof must correspond to the allegations. But to avail itself of this rule, the defendant was required to make timely objection to the variance. See Code 1919, sec. 6250; *Va. & S. W. R. Co.* v. *Bailey,* 103 Va. 205, 227, 49 S. E. 33; *Conrad* v. *Ellison-Harvey Co.,* 120 Va. 458, 463, 91 S. E. 763, Ann. Cas. 1918B, 1171.

In this case the plaintiff himself, who was the first witness in the case, testified directly to the fact that he was put to work without any instructions as to the dogs, and without any warning as to the necessity of placing the trolley in the center of the movable track to insure the operation of the safety catches. After testifying at some length, and stating very emphatically that he had been operating the machinery exactly as he had been shown by the foreman, and without in any way disregarding any of his instructions, he was asked the following question and gave the following answer:

"Q. I understood that you told the jury—I do not want to keep on repeating questions, but I believe you told the jury that Mr. Taylor did not warn you at all?"

"A. Not in the slightest degree of any danger that might possibly happen even."

Again, when he had been recalled, and before the testimony-in-chief in his behalf had been completed, he was asked the following questions and gave the following answers:

"Q. Mr. Crandall (plaintiff's witness), whom you heard testify, told the jury that this gig or trolley, if it got near your right-hand corner, was always liable to slip or fall off. Did you know that?"

"A. Not until Mr. Crandall said so."

"Q. You told the jury that Mr. Taylor (defendant's foreman) showed you how to operate the machine. Did he tell you about that?

"A. Not a word.

"Q. All he told you to do was to work the levers?

"A. Yes, sir."

If the defendant had objected to this testimony, or had moved to strike out, it is quite probable that the court would have sustained the objection on the ground that it did not appear to be within the allegations of the declaration, but the plaintiff would then have had an opportunity to amend his allegations to conform to the proof, and doubtless would have made such amendment. The defendant, however, neither objected to the evidence nor moved to strike it out, but, on the other hand, introduced proof to the contrary, and the conflict thus arising was a question for the jury. The question of variance between the allegation and the proof was waived, and cannot now be raised.

[3] It is further contended that the court ought to have set aside the verdict and entered final judgment for the defendant because the plaintiff (1) assumed the risk of the danger which resulted in his injury, and (2) was guilty of contributory negligence. As to these contentions, it is sufficient to say that the machinery and its operation, though simple enough when explained and understood, was unusual in its character, and that from the testimony before us we think the questions of whether the plaintiff assumed the risk or was guilty of contributory negligence were properly referred to the jury.

[4] The next assignment of error is as to the admission in evidence of a certain statement alleged to have been made out of court by one Miller. The plaintiff, in the course of his examination-in-chief, testified that Miller "was the head safety man at the plant while I was there," "the chief safety

man for the whole plant;" that while the plaintiff was at the hospital at Penniman, where he had been sent by the defendant for treatment, he was asked by the physician who was treating him, in the presence of Mr. Miller, to state how and under what circumstances he was injured; that he replied "that I was elevating shells, and as this shell that hit my foot went up, the safety had failed to catch and it came down on my foot;" and that thereupon Miller turned to the doctor and said: "Doctor, we have had a great deal of trouble with that machinery." This testimony was objected to upon the sole ground, so far as the record shows, that "it had not been shown that Mr. Miller had any right to bind the defendant here, although he was an employe. Miller ought to have been brought here."

We are of opinion that the court did not err in the admission of this evidence. In the absence of proof to the contrary, which, if it existed, could easily have been produced by the defendant, it is a perfectly natural and fair inference from what the witness said that Miller was an employe of the defendant company, was the head of its safety department, and was present at the hospital in connection with the plaintiff's injury in the regular course of his business. This being true, his statement was clearly admissible. *Lynchburg Telephone Co.* v. *Booker,* 103 Va. 594, 604, 50 S. E. 148; *Washington-Va. Ry. Co.* v. *Deahl,* 126 Va. 141, 145, 100 S. E. 840.

[5, 6] The admission in evidence of a statement by the plaintiff's witness Crandall is also assigned as error. This witness had worked for defendant at Penniman for about six months, and while it appears that he had only actually worked eight days in the particular building in which plaintiff was injured, his testimony showed perfect familiarity with the machinery and its operation. At the conclusion of his testimony-in-chief, he was asked the following question, and, over the objection and exception of the defendant, was allowed to make the following answer:

"Q. Now, I will repeat the question: I want you to tell the jury whether or not this thing in here (indicating gig) could have fallen if the machine had not been defective."

"A. I do not see how it could."

The first objection urged against this testimony is that the witness had not qualified as an expert, and had not shown any particular knowledge, science, skill or art in the construction or the operation of air-pressure elevators not possessed by ordinary persons. The objection does not appear to be sound. Upon the contrary, the witness gave perhaps the best description of the operation to be found in the record, and evinced very great familiarity with a very accurate knowledge of the machine. A further objection urged against this evidence is that it did not relate to any allegation in the declaration. The mere reading of the allegations above set forth and a comparison thereof with the question and answer will show that this point is not well taken. In any view of the matter, however, the evidence was immaterial, and its admission, even if erroneous, was harmless. The case quite plainly appears to have narrowed down at the trial to the question of whether the proximate cause of the accident was or not the failure of the defendant to warn and instruct the plaintiff. Crandall himself admitted on cross-examination, and it was conclusively proved, that the trolley could run off if not placed in the center of the short section and between the dogs; and before the case went to the jury it must have been understood by everybody connected with the trial that the accident was due to the fact that the trolley was not properly placed, and that the sole question for determination was, whether the defendant was liable to the plaintiff for a failure of duty in warning and instructing him in this particular.

This brings us to the question of instructions. Plaintiff's instruction No. 1, the giving of which is assigned as error, was as follows: "The court instructs the jury that it is

55

the paramount duty of the master to use ordinary care and diligence to provide his servants with reasonably safe machinery and appliances and such as are reasonably calculated to assure his safety, and to inspect and examine their machinery from time to time for the purpose of discovering and repairing defects therein. If, therefore, the master knew, or could have known, if he had used such care to ascertain the fact, that the air pressure and elevator or appliances which he had provided for his servants were defective and unsafe, and that the servant, without any negligence upon his part, was injured thereby, the master is liable, and the jury should find for the plaintiff."

[7] This instruction was not appropriately worded, but in view of the fact that the issue as developed by the evidence was as to whether the defendant failed in its duty with regard to plaintiff's safety by its failure properly to warn and instruct him with reference to the proper position of the trolley on the short section of track, we do not think the jury could have been misled by the instruction.

Plaintiff's instructions Nos. 2, 3 and 4, objected to, were brief abstract statements with reference to the law of negligence as applied to the relation of master and servant, and were so manifestly correct and free from error that we deem it unnecessary to make further comment upon them.

Plaintiff's instruction No. 5 told the jury that it was the duty of the defendant to exercise ordinary care to provide a reasonably safe place in which the plaintiff was required to work, and that if they believed that the defendant knew, or by the exercise of ordinary care on its part could have known, that the trolley could move from the center of the track which came down and thus be liable to fall with the suspended shell attached, and thereby rendered the place dangerous to the person operating the machine, and did not use reasonable care to warn the plaintiff of the danger, and that the plaintiff was ignorant of this fact, and could

not by the exercise of ordinary care on his part have discovered the danger, then the defendant is liable, and the jury should find for the plaintiff.

Plaintiff's instruction No. 6 told the jury that it was the duty of the defendant to provide a reasonably safe place in which the plaintiff was required to work, and that if they believed from the evidence that the place was not reasonably safe, that the plaintiff was ignorant of this fact and could not by the exercise of ordinary care discover the danger, it was the duty of the defendant to warn and inform him of it, and that in the absence of an official of higher grade this duty devolved upon the foreman under whom he was working.

[8]    These two instructions are objected to on the ground that there was no charge in the declaration, except with reference to the defective, unsafe and dangerous condition of the machinery, and that, therefore, these instructions dealt with questions outside of the allegation, and were for that reason erroneous. We have, however, seen that the case was tried upon a theory as to which the declaration might have been amended, upon testimony which would have been applicable to the declaration as so amended, and without any objection to such evidence.  In this view of the case the instructions complained of, while not as accurately phrased as they might have been, could not have been misunderstood by the jury, and cannot be made the ground of reversal.

[9]    There should be this further comment made with reference to the instructions: The plaintiff asked for eight, the defendant for twelve, and the court gave all of them exactly as offered.  These instructions, taken literally, covered practically every question of law which could have arisen as to the respective legal rights and duties of the plaintiff and defendant, even if the case had been one in which the evidence tended to show some defect rather than a more inherent danger of the machinery.  Why they were asked for

and given in this form, in view of the narrow· question of fact presented by the evidence, is not easy to understand. It is possible that they were prepared in advance of the actual introduction of the evidence, and afterwards offered and given without much consideration or scrutiny. Undoubtedly one of those given for the plaintiff and several of those given for the defendant might be construed to assume that a defective condition of the machinery was involved and relied upon by the plaintiff. The latter was true under the allegations of the declaration, but not true, as we think, under the issue as developed at the trial. Of course, it is well understood that instructions ought not to be given which are not applicable to the evidence, and that to give them constitutes reversible error where there is reason to suppose that they probably misled the jury. We do not think there was such probability in this instance.

Upon the whole case, we are of opinion that there has been a fair trial upon a narrow issue fully understood by the parties, the court and the jury, and that we ought not to interfere with the verdict and judgment.

*Affirmed.*